IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

STEPHEN HALL,                    )
                                    )
       Plaintiff,            )   TC-MD 120098N (Control)
                                    )         120099N
                                    )
       v.                     )
                                    )
LINCOLN COUNTY ASSESSOR,    )
                                    )
       Defendant.        )  **DECISION**

Plaintiff appealed the real market value of property identified as Accounts R22111 and

R329570 (subject property) for the 2011-12 tax year.[1]  A trial was held by telephone on

November 1, 2012.  Wyatt S. Baum, Attorney at Law, appeared on behalf of Plaintiff.  Plaintiff

testified on his own behalf.  Kristin Yuille, Assistant County Counsel, appeared on behalf of

Defendant.  Justin Reed (Reed), farm/forest appraiser, and Joe Davidson (Davidson), residential

appraiser, testified on behalf of Defendant.  Plaintiff's Exhibits 2 through 4 and Defendant's

Exhibits A through K were received without objection.  Defendant objected to Plaintiff's Exhibit

1, a transcript of the Board of Property Tax Appeals (BOPTA) proceeding on March 7, 2012.

Defendant raised issues related to the authenticity and accuracy of the transcript.  The court

allowed a limited admission of those parts of Plaintiff's Exhibit 1 that are accurate.  However,

neither of the parties' witnesses relied on Plaintiff's Exhibit 1.

## I.  STATEMENT OF FACTS

At the beginning of trial, the parties identified several agreed-upon facts.  The subject

property is a "code split"; two accounts located on one tax lot.  (Def's Ex H at 1.)  The subject

---

[1] Plaintiff filed two Complaints, TC-MD No 120098N and TC-MD No 120099N.  By Order of the court entered December 31, 2012, the court consolidated Plaintiff's appeals.

property is comprised of a five-acre improved parcel (Account R22111) and a 13-acre unimproved parcel (Account R329570). The subject property improvements include a 1,040-square foot house and a 320-square foot barn. Plaintiff purchased the subject property on February 17, 2011, for $56,700, including closing costs. (Ptf's Ex 3 at 1.) Plaintiff offered $54,000 and that offer was accepted in January 2011. (*Id.* at 2.)

Plaintiff testified that the subject property is located along Highway 20. He testified that the property to the north of the subject property is the King Salvage Yard, which is littered with batteries, tires, and other groundwater contaminants. Plaintiff testified that "DEQ" [Department of Environmental Quality] has fined the property owner for failing to clean up the property. He testified that the property to the south of the subject property is split by Highway 20; the land on the north side of the highway is at a higher elevation whereas the land on the south side of the highway floods frequently and was donated to the Oregon Department of Fish and Wildlife, which is creating fish habitat on the property. Plaintiff testified that the subject property is a continuation of the property located on the south side of Highway 20. He testified that the subject property house and barn are located on two acres at the top of a hill and the remaining 15 acres are located in a floodplain and are "wet" from about November until May or June each year. Reed testified that there is a lot of water on the subject property from about November through February of each year, but that is typical for the county, which includes many low-lying areas. Neither Plaintiff nor Reed was aware of a wetland delineation for the subject property.

Plaintiff testified that he purchased the subject property through an auction in February 2011. He testified that he learned of the auction because he saw a sign on the subject property. Plaintiff testified that he did not participate in the first auction of the subject property, but he found out that the high bid of $42,000 was not accepted by the bank (the seller). He testified that

he participated in the second auction and bid $48,000, but the bank did not accept his bid. Plaintiff testified that he retained a realtor and negotiated with the bank to an offer of $54,000, which was accepted. Defendant provided a questionnaire that Plaintiff completed following his purchase of the subject property; Plaintiff reported that there was "duress involved in the sale," explaining that the subject property sale was a "foreclosure" sale. (Def's Ex F.)

Plaintiff requests a 2011-12 real market value of $73,000 for the subject property based on the "Various Appeal Scenarios" (Scenarios) formula for properties sold after foreclosure during 2011. (Ptf's Ex 2.) According to the Scenarios, the "Formula Applied" when the "Subject Sold After Foreclosure During 2011" is "Sale price plus 30% plus 1% per month to 01/01/11 = recommended value." (*Id.*) Reed testified that Defendant's sales data analyst gave the Scenarios to BOPTA. (*See id.*) He testified the Scenarios are meant to be "guidelines" that can be used by BOPTA. Reed testified that he did not bring the Scenarios to Plaintiff's BOPTA hearing; rather, one of the BOPTA members brought it and wanted to rely upon it.

Reed and Davidson testified that they inspected the subject property on October 13, 2010. (Def's Ex B (photographs).) Reed testified that the subject property used to be part of a dairy. Plaintiff and Reed testified that the previous owner of the subject property kept "four llamas" on the subject property. Reed testified that the subject property was "grossly underutilized as a farm" so Defendant disqualified it from farm use special assessment. He testified that the previous owner did not appeal the disqualification and, eventually, the subject property was foreclosed upon. Plaintiff testified that he tried farming the subject property by acquiring four goats. He testified that, as of the date of trial, the subject property was rented for $900 per month and "all the wood you can burn."

/ / /

Reed testified that he used the sales comparison approach to determine the real market value of the subject property. (*See* Def's Ex K.) He testified that he determined a "Base Value" of $25,000 and a "Base SQ. Feet" of five acres and then made adjustments to the base value. (*See id.* at 1.) Reed testified that he considered only comparable sales located in the county and found that Plaintiff's purchase of the subject property was one of the lowest sales in the county. (*Id.* at 3.) He testified that many sales of "A-C" (agricultural conservation) zoned land in the county between 2010 and 2012 were bank and foreclosure sales. (Def's Ex J.) Reed identified eight sales of "A-C" zoned land and one sale of "T-C" [Timber Conservation] zoned land in the county between March 2010 and May 2012. (*Id.*) Eight of those sales involved improved lots ranging in size from 9 to 21.05 acres and ranging in price from $85,000 to $419,000.[2] (*Id.*) Reed noted that 18.65 acres with a 1,868-square foot house built in 1907 sold for $419,000 on October 7, 2010. (*Id.*) Reed testified that that property is at the same elevation as the subject property and, like the subject property, it is a "code split." (*Id.*) In response to Plaintiff's question, Davidson testified that both the seller and the buyer of the 18.65-acre property kept cattle on the property. Davidson conceded that the fact that the property is "farmable" likely has a positive effect on value.

Davidson testified that he used the Department of Revenue's 2005 Cost Factor Book, which is the most recent book available, to determine the real market value of the subject property improvements. He testified that the subject property is a "class 3" house in "49 percent good" condition (*i.e.* "poor condition"). Davidson testified that he valued the "barn" as a garage because it has a concrete foundation; he considered it also to be "49 percent good."

Plaintiff listed the subject property for $169,500 on Craigslist in August and September

---

[2] The ninth sale was 4.96 acres of land that sold for $100,000 on March 17, 2011. (Def's Ex J.)

2010.  (Def's Ex E.)  He testified that he did not list the subject property with a real estate agent. Plaintiff testified that he listed the subject property to "test" Defendant's assessed value for the subject property.  He testified that three people looked at the subject property as a result of his listing, but none returned or made an offer.

Plaintiff requests a 2011-12 real market value of $73,000 based on his purchase price and the applicable formula in the Scenarios.  (Ptf's Ex 2.)  The roll real market values of the subject property accounts are $102,120 (Account R22111, land and improvements) and $93,600 (Account R329570, land only), for a total of $195,720.  (Ptf's Compl at 2-3.)  The maximum assessed values of the subject property accounts are $102,120 (Account R22111) and $50,110 (Account R329570) for a total of $152,230.  (*Id.*)

## II.  ANALYSIS

The issue before the court is the real market value of the subject property for the 2011-12 tax year.  "Real market value is the standard used throughout the ad valorem statutes except for special assessments."  *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)).  Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."[3]

The assessment date for the 2011-12 tax year was January 1, 2011.  ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]"  ORS 308.205(2).  There are

---

[3] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

three methods of valuation that are used to determine real market value: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003). All three approaches must be considered, although all three approaches may not be applicable to the valuation of the subject property. OAR 150-308.205-(A)(2)(a). The approach of valuation to be used is a question of fact to be determined on the record. *Pacific Power and Light Co. v. Dept. of Rev.*, 286 Or 529, 533 (1979). Plaintiff relies on his purchase price and the formula for 2011 sales following foreclosure provided in the Scenarios. Defendant relied on comparable sales for the land and the cost approach for the improvements.

Plaintiff has the burden of proof and must establish his case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). Competent evidence includes, "appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D, WL 879285 (Mar 13, 2012). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Plaintiff did not submit an appraisal report, relying instead on his purchase of the subject property in February 2011. The lack of an appraisal is not fatal because "[t]he various

/ / /

approaches to valuation * * * are only the vehicles used to determine the ultimate fact – market value." *Kem v. Dept. of Rev.,* 267 Or 111, 114, 514 P2d 1335 (1973).

> "A recent sale of the property in question is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sale price, while certainly not conclusive, is very persuasive of the market value."

*Id*. (citations omitted). Plaintiff's purchase in February 2011 was "recent" as of January 1, 2011. The question becomes whether the sale was a "voluntary, arm's length transaction."

Plaintiff submitted the highest bid in the second auction sale of the subject property. "This court has made a distinction between the sale of bank owned properties using a multiple listing service and an auction." *Godzilla Investment LLC v. Multnomah County Assessor*, TC-MD No 120199D, WL 3291789 at *4 (Aug 13, 2012). "An auction is defined as a 'sale of property to the highest bidder.' An auction eliminates the negotiation between the buyer and seller and requires buyers to negotiate with each other, generally leaving the seller out of the negotiation process." *Schnabel v. Clatsop County Assessor*, TC-MD No 100618D, WL 646678 at *2 (Feb 22, 2011), *citing Webster's Third Int'l Dictionary* 142 (unabridged ed 2002). Thus, an auction sale is not an "arm's-length transaction" under ORS 308.205 and is not necessarily indicative of real market value.

Although the subject property was twice offered for auction, Plaintiff's winning bid in the second auction was not accepted by the bank selling the subject property and Plaintiff ultimately increased his offer before it was accepted by the bank. Thus, Plaintiff's purchase of the subject property involved some negotiation between the buyer and the seller. However, the subject property was sold following foreclosure and, as Plaintiff reported on Defendant's questionnaire, involved some "duress" because of the foreclosure.

/ / /

"This court has been reluctant to consider 'foreclosure' sales as 'arm's-length transactions' because such sales 'may well involve an element of compulsion on the part of the seller.' " *Voronaeff v. Crook County Assessor*, TC-MD No 110361C, WL 1426847 at *4 (Apr 25, 2012) (citations omitted). "There are many practical reasons why the sale of a property following foreclosure by the lender might involve an atypical market condition rendering the transaction of little or no value as an indication of market value." *Kryl v. Lane County Assessor*, TC-MD No 100192B, WL 1197444 at *2 (Mar 30, 2011). However, property purchased through foreclosure may be "a voluntary *bona fide* arm's-length transaction between a knowledgeable and willing buyer and a willing seller." *Ward v. Dept. of Revenue*, 293 Or 506, 508, 650 P2d 923 (1982) (emphasis in original). "There are narrow exceptions determined on a case-by-case basis to the holding that bank-owned property sales are not typically representative of real market value." *Brashnyk v. Lane County Assessor*, TC-MD No 110308, WL 6182028 *5 (Dec 12, 2011)(emphasis in original). "[W]here the majority of the sales are distress, it would seem that that kind of sale would provide a more accurate reflection of the market." *Morrow Co. Grain Growers v. Dept. of Rev.* (*Morrow*), 10 OTR 146, 148 (1985).

Plaintiff's purchase of the subject property following foreclosure was not a "voluntary, arm's-length transaction." Plaintiff adjusted the purchase price of the subject property using the formula for 2011 sales following foreclosures provided in the Scenarios. Reed testified that the Scenarios are guidelines developed by Defendant's sales data analyst. Plaintiff provided no reliable evidence supporting the application of the Scenarios in this case. As a result, the court finds that Plaintiff's purchase price, adjusted using the formula for 2011 sales following foreclosure, is not persuasive evidence of the real market value of the subject property.

/ / /

Reed provided a list of eight "A-C" zoned sales and one "T-C" zoned sale in the county between 2010 and 2012, at least four of which are described as "not open market" sales or "bank foreclosure resale[s]." (Def's Ex J.) That evidence suggests that distress sales may have been common for properties in the subject property's market as of January 1, 2011. However, the nine properties identified by Reed all sold for more than Plaintiff's requested real market value of $73,000. The sales identified by Reed support the 2011-12 roll real market value of the subject property.

### III. CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that Plaintiff failed to prove by a preponderance of the evidence that the 2011-12 real market value of the subject property was $73,000. Plaintiff's appeal must be denied. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ____ day of December 2012.

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Magistrate Allison R. Boomer on December 31, 2012. The court filed and entered this Decision on December 31, 2012.*